Decided 28 April, 1902.

## GOODALE *v.* WHEELER.

[68 Pac. 753.]

FRAUDULENT CONVEYANCE—SUFFICIENCY OF EVIDENCE.

1. Defendant, while heavily indebted, organized a corporation, the stockholders of which were his wife and sons and two others, who were nominal stockholders only, to which he transferred his property at an excessive valuation, receiving therefor stock and notes of the corporation. The directors of the concern were authorized to issue bonds for the debts of the corporation, and defendant took all the bonds, and applied them as payments on the notes. As president of the corporation he managed all its affairs, and only two meetings of the directors were held. Defendant charged against the company certain sums in favor of his sons for alleged services rendered prior to the organization, and subsequently conveyed property of the corporation to them,

charging them therefor on their account with the corporation. The sons conveyed the same to defendant's wife without consideration. *Held,* that the conveyances were void, as in fraud of creditors.

CREDITOR'S BILL—NOTICE—INNOCENT PURCHASERS.

2. The sons, having knowledge of the purpose of the organization and attending circumstances, could not claim as innocent purchasers, though the consideration may have been valuable.

CONVEYANCE TO RELATIVES—BURDEN OF PROOF—CREDIT.

3. Where property is conveyed to a relative under suspicious circumstances, the burden of proof is on the latter to show the good faith of the transaction.

From Lane: JAMES W. HAMILTON, Judge.

Creditor's bill by J. C. Goodale against A. Wheeler and others to set aside alleged fraudulent conveyances. From a decree for plaintiff, defendants appeal.          AFFIRMED.

For appellants there was a brief over the name of *Chamberlain & Thomas,* with an oral argument by *Mr. Geo. E. Chamberlain.*

For respondent there was a brief and an oral argument by *Mr. John M. Williams* and *Mr. L. Bilyeu.*

MR. JUSTICE WOLVERTON delivered the opinion.

1. This is a creditors' suit instituted June 12, 1899, to have A. Wheeler declared to be the owner of lots 1 and 2, block 6, in Fairmount, Lane County, Oregon, to set aside certain conveyances of said lots and subject them to the payment of plaintiff's demand. On October 22, 1892, plaintiff and others became sureties for Wheeler upon a promissory note, which remaining unpaid, a judgment was, on June 12, 1896, obtained against all the makers. Plaintiff subsequently paid the judgment, amounting to $1,874.35, and on May 13, 1899, filed his notice of such payment and claim for contribution against the co-sureties for their *pro rata* share thereof, and against Wheeler for the whole amount. Subsequently execution was issued and returned *nulla bona.* That Wheeler is indebted to the plaintiff in this amount with accumulated interest is satisfactorily established. The defendant, Mary B. Wheeler,

is the wife of A. Wheeler, and O. A. Wheeler, T. C. Wheeler, and A. C. Wheeler are his sons and the stepsons of Mary B. Wheeler. The defendant the Lane Lumber League was incorporated and organized about July 28, 1892, with a capital stock of $50,000, divided into 500 shares of $100 each. A Wheeler subscribed for 250 shares, O. A. Wheeler for 18, T. C. Wheeler for 9, and W. N. Cheesman and B. A. Washburne for 1 each. Cheesman and Washburne paid nothing on their stock, and were conceded to be only nominal stockholders. On the day of the organization of the company by the election of directors, A. Wheeler and T. C. Wheeler made a proposition, which was accepted, to sell to the company certain property at values placed opposite the description thereof, namely: A sawmill, planing mill, water rights under lease for 99 years, stable, sheds, yards, etc., $21,000; timber land, section 16, township 18 south, range 1 east, $3,500; lumber to be invoiced, $3,500; merchandise, safe, teams, wagons, camp equipments, etc., $1,700; logs, 2,224,254 feet at 4½, $10,009.14; interest in lumber and accounts of the U. W. L. M. Association, at Eugene, $3,200; lumber on the yard at Albany, $2,000; total, $44,909.14, payable in capital stock of the company for $27,700, and its notes for the balance. On August 29, 1892, A. Wheeler and Mary B., his wife, by deed then delivered, of date July 29, 1892, and by other transfers, conveyed to the company all the real property noted in the above schedule, except one half of the school section, which purports to have been transferred by O. A. Wheeler, whereupon the company executed and delivered to A. Wheeler eleven notes, aggregating $16,683.44, due and payable at dates ranging from September 5, 1892, to July 5, 1893. There was due the state, upon the school section tranferred, the sum of $400, which the company assumed, but to reimburse it therefor Wheeler agreed to indorse the amount upon the last of its notes to fall due. The stock books were made to show that 279 share of the capital stock of the company were fully paid up, and it was ordered that the stock be issued. On November 25, 1892, the directors of the company were authorized to issue $10,000 in bonds, and

to execute a mortgage on the real property of the concern to secure the payment of the same, the proceeds to be applied towards the payment of its existing indebtedness. These matters are shown by the minutes of the directors' meetings. On October 7, 1895, at a directors' meeting called for the purpose, the company was authorized to convey to H. C. Humphrey certain real property valued at $1,200, to be sold by him and the proceeds applied in satisfaction of certain interest due on its bonds. This was the last meeting attempted to be held by the board of directors, and none were held between November 25, 1892, and that time. Nor does there appear to have been any meeting of the stockholders, except the first, held on June 28, 1892. H. C. Hunter conveyed to O. A. Wheeler, trustee, the property in question, June 5, 1894. On May 15, 1895, he conveyed to T. C. and A. C. Wheeler, and on the same day they conveyed to Mary B. It is alleged, in effect, that at the time of the organization of the Lane Lumber League the defendant A. Wheeler was insolvent; that the company was organized by and at his instigation, as a scheme to enable him to cover up his property and defraud his creditors, and to that end he transferred to it all of his property; that O. A. Wheeler took and received said deed nominally as a trustee for the company, but in reality for A. Wheeler, who was the real beneficiary; that O. A. conveyed to T. C. and A. C., and they to the wife, Mary B., without consideration, and that such conveyances were fraudulent as to the plaintiff, and a hindrance to the enforcement of his judgment against the defendant A. Wheeler. It is admitted that Mary B., gave nothing for the property, and the father and sons all say that it was a gift to her by the sons. Wheeler asserts that he was not insolvent at the time, and denies any purpose of defrauding his creditors, through the instrumentality of the corporation or otherwise. His indebtedness, he states, was about $25,000, and that his assets consisted of the property turned into the company and some $11,100 in stocks, notes, and accounts, which he retained in his own right, or to put in another way, he asserts that his

assets, after the organization and transfer to the company, consisted of $25,000 in stock of the company, its notes for $16,683.44, and stocks. notes, and accounts retained, $11,100; total $52,783.44.

The evidence discloses that the mill property, including the planing mill, water rights, etc., denoted by the first item in the schedule, valued at $21,000, was incumbered at the time by a mortgage to the school fund for $5,000, which Wheeler was to pay. He subsequently reduced it to $2,000, but, being unable to pay the balance, it was foreclosed, and the property was bought in by the state for $800. The timber land, turned in at a valuation of $3,500, was incumbered, as we have seen, with a debt of $400. This was subsequently sold for $900, and the state paid out of the proceeds. The logs were incumbered with $2,000, which Wheeler agreed to pay, and which he says he subsequently paid. The item of interest in lumber and accounts of U. W. L. M. Association, it subsequently transpired, amounted to an estimated valuation of $1,200, instead of $3,200, and it is not apparent what was finally realized from it; so that we find a shrinkage in four of the principal items of property transferred to the company of $27,000; nor is it clearly shown what was realized from the other items. Of the $11,100 in stock, notes, and accounts, he has realized, according to his own statement, stock in the McKenzie Lumber Co., (not in money) $600, stock in Eugene Lumber Co., $979; on notes and accounts in Albany probably $3,000. Besides this, he had notes and accounts at Springfield, estimated at from $1,500 to $2,500, but what was realized thereon is not apparent. If they be valued at $2,000, probably an excessive estimation, his individual assets would be reduced to $6,579, showing that his entire assets were less than his indebtedness, and probably much less than the estimates here made. We have not the means of ascertaining what amount was realized from some of the items, as there is no testimony in the record to show it. But it is quite probable that Wheeler was insolvent at the time of the incorporation of the company.

The business was carried on actively and steadily for one year, and, at intervals, for another. The logs transferred were sawed into lumber, but none others, although perhaps 1,000,000 feet were put into the pond. Wheeler was the president of the company, and by virtue of his office general manager. He states, however, that he and the boys were the agents of the concern, and transacted and managed all its business. Of the bonds that were issued he took the entire lot, and canceled the company's indebtedness on the notes given to him therefor. These bonds he transferred to the creditors in payment of his indebtedness to them, but not one of them has been paid, although there is evidence of payment of a portion of the interest. He was indebted to his son O. A., according to his testimony, for services rendered him prior to the incorporation of the company, in the sum of $1,026.34. This, with $120 interest thereon, he paid by canceling that amount of the company's indebtedness by note to him and giving his son credit on the books. So with T. C. He charged the company with $607 accrued for services rendered prior to the organization, together with $100 interest, and credited the son. The above items standing to the credit of O. A., with others, amounted on May 15, 1894, to $1,550.59, against which there appears a debt of $608.88, leaving a balance of $941.71 due him. As to T. C., the above items, with others, amounted on that date, to $1,093.11. On this date O. A. made the conveyance to T. C. and A. C. for the alleged consideration of $500, in payment whereof Wheeler, on the next day, charged each of the three sons $166.66 in their respective accounts with the company. On the same day A. C. Wheeler was credited on his account with $302.84. Wheeler, explaining this credit, says the remnant or last of the lumber belonging to the company was sold to Wheeler Bros., a copartnership composed of the three sons, and this amount was turned over to A. C. out of the proceeds by Wheeler, to be by him turned over to Wheeler's family at intervals for their use while he was to be away from home. The company, he says, owed him a balance of salary, and this was transferred from his account; that is, charged on

the books of the company and credited to the account of A. C. The accounts of the other two sons were charged, one with $370.62, and the other $446.44, on account of this sale.

It is a matter of grave doubt whether O. A. and T. C. ever paid anything on their stock. The evidence shows, in effect, that A. Wheeler was the owner, or at least the holder, of the certificate from the state to the section of school land turned into the company, and whatever title it acquired thereto was by assignment from him. Indeed Wheeler says his sons had no interest in the property prior to the organization of the company, and yet one half of the section is devoted at a fancy figure to the payment of the major portion of O. A.'s 18 shares, and one fourth to T. C.'s 9 shares, of the capital stock. So that it is but a reasonable and altogether natural deduction to conclude that A. Wheeler was the sole beneficiary of the operations of the concern. Its property was his property, and his debts, by a skillful circumlocution of bookkeeping, and a liberal use and transformation of negotiable paper, were made its debts *ad libitum*. The company had long ceased to be an operative concern, or even an entity, except in name, and Wheeler controlled it absolutely for his own benefit. It is under these conditions that lumber, nominally the company's, was exchanged with Hunter for the property in dispute, and deeded to O. A. as trustee for the company. This, it is related, was done as a matter of convenience. Eleven months later the sons purchased, and Wheeler, acting in behalf of the company, sold, the property to them, and the alleged payment is made in the manner as above indicated; Wheeler, in effect, charging his own account and crediting the same with the supposed consideration.

2. The transfer of the $302.84 to the credit of A. C. in his account with the company, for the use of Wheeler's family, is indicative of the manner in which he utilized and treated the funds of the company,—simply as if they were his own. He may just as well have taken the money and given it direct to his family, and the charging of his own account with the amount was idle formality, as the account was, in effect, with

himself. The sons were fully cognizant of the true status of
the organization; that their dealings with it were in reality
with their father; and that when they purchased the prop-
erty in question they purchased of their father. They knew,
of course, that the device served as a cloak to shield the prop-
erty against the diligence and scrutiny of creditors, and was
well calculated to delude and mislead them, and that the prop-
erty was kept sequestered and secluded, and its real identity
as regards the ownership concealed, and continued so until it
reached the hands of Mrs. Wheeler. So they were in reality
parties to whatever purpose the father had in mind in thus
concealing and finally procuring the property to be deeded to
his wife. That it was his purpose eventually to elude the de-
mand of plaintiff there is no longer any doubt, and that he
caused the title of the property in question to pass through his
sons, thence to his wife, for the accomplishment of that end,
is a perfectly consistent and an altogether natural sequence of
that purpose. With the knowledge of the purpose and the at-
tending circumstances, the sons are chargeable with his inten-
tions, and it matters not if they parted with value. They have
thus become parties to the fraud, and cannot, therefore, claim
as innocent purchasers.

3. To say the least, the transactions are attended all the way
along with such an atmosphere of distrust, and, being among
near relatives, the defendants were called upon to explain and
to establish the exercise of entire good faith to overcome the
*prima facie* case made by the proof favorable to the plaintiff's
cause, and this they have not done. The principles here in-
volved and stated find support in *Currie* v. *Bowman,* 25 Or.
364 (35 Pac. 848, 44 Am. & Eng. Corp. Cas. 662); *Jolly* v.
*Kyle,* 27 Or. 95 (39 Pac. 999); *Bennett* v. *Minott,* 28 Or. 339
(39 Pac. 997, 44 Pac. 288), and serve in their application to
the facts to affirm the decree of the trial court, and it is so or-
dered.          AFFIRMED.